# IN THE SUPREME COURT OF CALIFORNIA

In re Ja.O., a Person Coming Under
the Juvenile Court Law.

---

SAN BERNARDINO COUNTY CHILDREN AND FAMILY
SERVICES,
Plaintiff and Respondent,
v.
A.C.,
Defendant and Appellant.

S280572

Fourth Appellate District, Division Two
E079651

San Bernardino County Superior Court
J291031, J291032, J291033, J291034, J291035

---

August 4, 2025

Justice Jenkins authored the opinion of the Court, in which
Chief Justice Guerrero and Justices Corrigan, Groban, and
Evans concurred.

Justice Liu filed a concurring opinion in which Justice Kruger
concurred.

In re Ja.O.

S280572


Opinion of the Court by Jenkins, J.


In 1978, Congress enacted the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.) "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families" in child custody proceedings, including juvenile dependency cases. (25 U.S.C. § 1902; see 25 U.S.C. § 1903(1); 25 C.F.R. § 23.106 (2024).) To that end, California law imposes "an affirmative and continuing duty" on the court, county welfare department, and probation department "to inquire whether a child for whom a [dependency] petition . . . may be or has been filed, is or may be an Indian child." (Welf. & Inst. Code, § 224.2, subd. (a).)[1] This duty, which begins with the "first contact" for the county (*id.*, subd. (b)(1)) and the "first hearing" or "first appearance" for the court (*id.*, subd. (c)), "is sometimes referred to as the initial duty of inquiry, [although] this is a bit of a misnomer, as the duty 'continues throughout the dependency proceedings' " (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1132).

This case involves a question about the scope of the initial inquiry duty, in particular, the county welfare department's duty to ask "extended family members" and others whether a child placed in its temporary custody "pursuant to Section 306" is or may be an Indian child (the extended-family inquiry duty).

---

[1]    All further unspecified statutory references are to the Welfare and Institutions Code.

(Former § 224.2, subd. (b)(2) (Stats. 2018, ch. 833, § 5).)[2] Courts of Appeal have disagreed whether this duty arises whenever a child is placed into a county welfare department's temporary custody, or only when a child is placed into a department's temporary custody after being removed from the home without a warrant. (See, e.g., *In re Ja.O.* (2023) 91 Cal.App.5th 672, 676 (*Ja.O.*) [extended-family inquiry duty arises only when a child is placed into temporary custody after being removed from the home without a warrant]; *In re Robert F.* (2023) 90 Cal.App.5th 492, 498 (*Robert F.*), review granted July 26, 2023, S279743 [same]; *In re Delila D.* (2023) 93 Cal.App.5th 953, 962 (*Delila D.*), review granted Sept. 27, 2023, S281447 [extended-family inquiry duty applies whenever a child is placed into temporary custody, regardless of whether the child was removed from the home with or without a warrant]; *In re Samantha F.* (2024) 99 Cal.App.5th 1062, 1069 [agreeing with *Delila D.*], disapproved of on another ground by *In re Dezi C.*, *supra*, 16 Cal.5th at p. 1152, fn. 18.) We granted review here to resolve this conflict.

After we granted review, the Legislature passed Assembly Bill No. 81 (2023–2024 Reg. Sess.) (Assembly Bill 81), and the Governor signed the bill as an urgency measure on September 27, 2024, effective immediately. (Stats. 2024, ch. 656.) Assembly Bill 81 amended former section 224.2 to add language specifying that the extended-family inquiry duty applies whenever a child is placed into a county welfare department's temporary custody, regardless of how the child is removed from the home. Assembly Bill 81 therefore resolves the conflict before

---

[2]     All references to "former section 224.2" are to Stats. 2018, ch. 833, § 5.

us for all cases in which a child was placed into temporary custody on or after the bill's effective date.

What remains to be decided is whether the extended-family inquiry duty applies in pre-Assembly Bill 81 cases where the child was placed into a county welfare department's temporary custody after being removed from the home pursuant to a warrant. We requested and received supplemental briefing from the parties and amicus curiae on the significance, if any, of Assembly Bill 81 on this case. For the reasons set forth below, we conclude the county welfare department has an extended-family inquiry duty in pre-Assembly Bill 81 cases.

## FACTUAL AND PROCEDURAL BACKGROUND

In October 2021, the five children of petitioner A.C. (Mother) were removed from their home pursuant to a protective custody warrant under section 340[3] and placed into the temporary custody of San Bernardino County Children and Family Services (the Department). The Department filed dependency petitions for all five children.

---

[3] Section 340, subdivision (b) provides that "[a] protective custody warrant may be issued without filing a petition under Section 300 if the court finds probable cause to support all of the following: [¶] (1) The child is a person described in Section 300. [¶] (2) There is a substantial danger to the safety or to the physical or emotional health of the child. [¶] (3) There are no reasonable means to protect the child's safety or physical health without removal." Subdivision (c) provides, "Any child taken into protective custody pursuant to this section shall immediately be delivered to the social worker who shall investigate . . . the facts and circumstances of the child and the facts surrounding the child being taken into custody and attempt to maintain the child with the child's family through the provision of services."

At the detention hearing, Mother denied the children had Indian ancestry,[4] and she reiterated this in an ICWA form. R.O., the father of the two youngest children, Ja.O. and Je.O. (Father),[5] also denied Indian ancestry at, and after, the detention hearing but checked a box on an ICWA form that states, "One or more of my parents, grandparents, or other lineal ancestors is or was a member of a federally recognized tribe." At an August 2022 contested jurisdiction and disposition hearing, the juvenile court found ICWA did not apply, took jurisdiction over the children, removed them from parental custody, and ordered reunification services for Mother.

On appeal, Mother argued for reversal of the jurisdiction and disposition order based on the Department's failure to satisfy its extended-family inquiry duty under former section 224.2, subdivision (b), which stated at the time: "If a child is placed into the temporary custody of a county welfare department *pursuant to Section 306* . . . the county welfare department . . . has a duty to inquire whether that child is an Indian child. Inquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, *extended family members*, others who have an interest in the child, and the party

---

[4] "[B]ecause ICWA uses the term 'Indian,' we do the same for consistency, even though we recognize that other terms, such as 'Native American' or "[I]ndigenous,' are preferred by many." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1.)

[5] The whereabouts of the oldest child's father were unknown for much of the proceedings. It appears he made one telephonic appearance and denied Indian ancestry but did not fill out an ICWA form as ordered by the court. The father of the two middle children is deceased.

4

reporting child abuse or neglect, whether the child is, or may be, an Indian child." (Italics added.)[6]

Section 306, in turn, provides: "(a) Any social worker in a county welfare department . . . may do all of the following: [¶] (1) Receive and maintain, pending investigation, temporary custody of a child who is described in Section 300, and who has been delivered by a peace officer. [¶] (2) Take into and maintain temporary custody of, without a warrant, a child who has been declared a dependent child of the juvenile court under Section 300 or who the social worker has reasonable cause to believe is a person described in subdivision (b) or (g) of Section 300, and the social worker has reasonable cause to believe that the child has an immediate need for medical care or is in immediate danger of physical or sexual abuse or the physical environment poses an immediate threat to the child's health or safety. [¶] (b) Upon receiving temporary custody of a child pursuant to subdivision (a), the county welfare department shall inquire

---

[6]     Other relevant subdivisions of former section 224.2 provided: "(a) The court, county welfare department, and the probation department have an affirmative and continuing duty to inquire whether a child for whom a [dependency] petition . . . may be or has been filed, is or may be an Indian child. The duty to inquire begins with the initial contact, including, but not limited to, asking the party reporting child abuse or neglect whether he or she has any information that the child may be an Indian child. [¶] . . . [¶] (c) At the first appearance in court of each party, the court shall ask each participant present in the hearing whether the participant knows or has reason to know that the child is an Indian child. The court shall instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child."

pursuant to Section 224.2, whether the child is or may be an Indian child."

Mother asserts the Department knew the names of "numerous family members and close family friends" but did not fulfill its extended-family inquiry duty because it asked only one of them about the children's potential Indian ancestry. The Court of Appeal rejected Mother's argument, holding the extended-family inquiry duty did not apply because her children were placed into the Department's temporary custody after being removed from their home *pursuant to a warrant under section 340* and were therefore not "placed into the temporary custody of a county welfare department *pursuant to Section 306*," as specified in former section 224.2, subdivision (b). (See *Ja.O.*, *supra*, 91 Cal.App.5th at pp. 678–679.) In other words, the Court of Appeal interpreted the phrase "placed into . . . temporary custody . . . pursuant to Section 306" as referring only to situations in which a child is placed into temporary custody after being removed from the home *without a warrant*. (*Ja.O.*, at p. 678.)

Two months later, a majority of the Court of Appeal in *Delila D.* disagreed, interpreting the same statutory phrase in former section 224.2 — "placed into . . . temporary custody . . . pursuant to Section 306" — more broadly to hold the extended-family inquiry duty arises whenever a child is placed into temporary custody, "both when the child has been taken from home by a social worker or police officer under exigent circumstances without a warrant (§ 306, subd. (a)(1) & (2)) *and* when the child has been taken from home by means of a protective custody warrant issued under section 340 (§ 306, subd. (a)(1))." (*Delila D.*, *supra*, 93 Cal.App.5th at p. 971, review granted.) The *Delila D.* majority further held that to the

extent the phrase was ambiguous, the extended-family inquiry duty should be interpreted broadly to effectuate ICWA's purpose, reasoning: "Applying a narrower initial inquiry to the subset of dependencies that begin with a temporary removal by warrant frustrates the purpose of the initial inquiry." (*Delila D.*, at p. 962.) "The goal of the initial inquiry is to determine whether ICWA's protections may apply to the proceeding, and the way a child is initially removed from home has no bearing on the question of whether they may be an Indian child." (*Ibid.*)

## DISCUSSION

As noted above, Assembly Bill 81 was passed and took effect after we granted review. Section 224.2, as amended by Assembly Bill 81, continues to state, as it did before amendment, that "[t]he court, county welfare department, and the probation department have an affirmative and continuing duty to inquire whether a child for whom a [dependency] petition . . . may be or has been filed, is or may be an Indian child." (§ 224.2, subd. (a), as amended by Stats. 2024, ch. 656, § 3; see former § 224.2, subd. (a).) The amended statute specifies the point at which the county welfare department's inquiry duty begins: "[W]hen first contacted regarding a child, including, but not limited to, asking a party reporting child abuse or neglect whether the party has any information that the child may be an Indian child, and upon a county department's first contact with the child or the child's family, including extended family members." (§ 224.2, subd. (b)(1).)[7]

---

[7] Section 224.2, subdivision (c), as amended, states a court's initial inquiry duty "begins at the first hearing on a petition" and requires the court to "ask each party to the proceeding and

As amended by Assembly Bill 81, section 224.2, subdivision (b)(2), now provides in relevant part: "If a child is . . . *received and maintained in temporary custody of a county welfare department pursuant to paragraph (1) of subdivision (a) of Section 306, or taken into or maintained in the temporary custody of a county welfare department pursuant to paragraph (2) of subdivision (a) of Section 306, or if they were initially taken into protective custody pursuant to a warrant described in Section 340*, the county welfare department . . . has a duty to inquire whether that child is an Indian child. Inquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child." (Stats. 2024, ch. 656, § 3, italics added.)

As is evident, the language Assembly Bill 81 added to former section 224.2 (as italicized above) references the various ways in which a child may be placed into the county welfare department's temporary custody including, as relevant here, "pursuant to a warrant described in Section 340." (§ 224.2, subd. (b)(2).) Thus, the amended statute makes clear the extended-family inquiry duty applies when a child is placed into the county welfare department's temporary custody after being removed from the home pursuant to a warrant under section 340. The parties agree with this conclusion, with the Department conceding that under section 224.2's current

all other interested persons present whether the child is, or may be, an Indian child, whether they know or have reason to know that the child is an Indian child . . . . Inquiry shall also be made at the first appearance in court of each party or interested person who was not present at the first hearing on the petition."

language, county welfare departments have "an obligation to make an extensive initial inquiry in all cases," not "in warrantless cases only."

The parties disagree, however, whether the extended-family inquiry duty also applies in cases like this one, where the child was placed into the county welfare department's temporary custody after being removed from the home pursuant to a section 340 warrant *before* Assembly Bill 81 took effect in 2024. Mother maintains the duty applies in such cases because Assembly Bill 81 merely *clarified* former section 224.2. In other words, her position is that even before Assembly Bill 81, county welfare departments had an extended-family inquiry duty in cases where a child was placed into temporary custody after being removed from the home pursuant to a section 340 warrant. Mother asserts this was the "general understanding" among courts and parties, "as evidenced by County Counsel's concession brief filed [below]." (Citing *In re C.L.* (2023) 96 Cal.App.5th 377, 385 [noting that "[e]arly decisions" of the Court of Appeal stated the extended-family inquiry duty " 'applies in every dependency proceeding' "]; see also *In re D.M.* (2024) 101 Cal.App.5th 1016, 1052 (dis. opn. of Raphael, J.) [applying the extended-family inquiry " 'in every case' " "was not controversial"].)

The Department agrees with Mother that a statutory amendment "is properly applied to transactions predating its enactment" if it "clarifies, rather than changes, existing law," but it asserts that Assembly Bill 81 "substantially change[d]" existing law "by adding an obligation to make an expansive initial inquiry in all cases, rather than in warrantless cases only." The Department further asserts that Assembly Bill 81's amendments therefore do not apply to pre-Assembly Bill 81

cases unless the Legislature intended that they have retroactive effect, and the Legislature's "intent [was] for prospective application only."

## Assembly Bill 81 Clarified, Rather than Changed, Existing Law

### Statutory Interpretation

As the parties agree, our precedents establish that when a statutory amendment clarifies, rather than changes, existing law, the amendment "is properly applied to transactions predating its enactment" (*Carter v. California Department of Veterans Affairs* (2006) 38 Cal.4th 914, 922 (*Carter*)) because "the true meaning of the statute remains the same" (*Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 243 (*Western Security Bank*)).

Among the circumstances we may consider in evaluating whether an amendment clarified or changed existing law is whether the Legislature, in amending a statute, "promptly react[ed] to the emergence of a novel question of statutory interpretation." (*Western Security Bank*, *supra*, 15 Cal.4th at p. 243.) If so, " ' "it is logical to regard the amendment" ' " as clarifying — not changing — the law. (*Ibid.*) In addition, where " 'the courts have not yet finally and conclusively interpreted a statute and are in the process of doing so, a declaration of a later Legislature as to what an earlier Legislature intended is entitled to consideration.' " (*Carter*, *supra*, 38 Cal.4th at p. 922, quoting *McClung v. Employment Development Dept.* (2004) 34 Cal.4th 467, 473; *Western Security Bank*, at pp. 244–245 [the Legislature's statement that an amendment clarifies existing law reflects its intent to apply the amendment to all existing cases including those that precede the amendment].)

Ultimately, however, "the interpretation of a statute is an exercise of the judicial power the Constitution assigns the courts." (*Western Security Bank, supra*, 15 Cal.4th at p. 244.) Although "the Legislature's expressed views on the prior import of its statutes are entitled to due consideration," "a legislative declaration of an existing statute's meaning is neither binding nor conclusive in construing the statute." (*Ibid.*) "Indeed, there is little logic and some incongruity in the notion that one Legislature may speak authoritatively on the intent of an earlier Legislature's enactment when a gulf of decades separates the two bodies." (*Western Security Bank*, at p. 244.)

Here, we will evaluate the scope of the extended-family inquiry duty under former section 224.2 by applying settled principles of statutory interpretation.[8] "Our fundamental task in interpreting a statute is to determine the Legislature's intent so as to effectuate the law's purpose." (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737 (*Coalition of Concerned Communities*).) "We first consider the words of the statutes, as statutory language is generally the

---

[8]    We will not consider the other circumstances — i.e., the Legislature's statements in amending former section 224.2 or the timing of the amendment (*Western Security Bank*, at pp. 243–245; *Carter, supra*, 38 Cal.4th at p. 922) — because our statutory interpretation answers the question before us. To the extent the language from *Bruesewitz v. Wyeth LLC* (2011) 562 U.S. 223, 242 (quoted as a "see" cite in *Coker v. JPMorgan Chase Bank, N.A.* (2016) 62 Cal.4th 667, 690) creates tension with *Western Security Bank* and other prior cases (e.g., *Carter*, at p. 922; *California Employment Stabilization Commission v. Payne* (1947) 31 Cal.2d 210, 213–214) (see conc. opn. of Liu, J., a p. 1), we note that we have not expressly addressed the continued propriety of considering these other circumstances, nor have we overruled our prior cases.

most reliable indicator of legislation's intended purpose." (*McHugh v. Protective Life Ins. Co.* (2021) 12 Cal.5th 213, 227.) "We consider the ordinary meaning of the relevant terms, related provisions, terms used in other parts of the statute, and the structure of the statutory scheme." (*Ibid.*) "The meaning of a statute may not be determined from a single word or sentence; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible." (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735.) If the statutory "text is unambiguous and provides a clear answer, we need go no further." (*Microsoft Corp. v. Franchise Tax Bd.* (2006) 39 Cal.4th 750, 758.) It is only when the language supports more than one reasonable construction that we look to appropriate extrinsic sources, such as the statute's purpose, legislative history, and public policy. (*Coalition of Concerned Communities*, at p. 737.)

### 1. The Plain Meaning of Former Section 224.2

Subdivision (a) of former section 224.2 provided: "The court, county welfare department, and the probation department have an affirmative and continuing duty to inquire whether a child for whom a [dependency] petition . . . may be or has been filed, is or may be an Indian child. The duty to inquire begins with the initial contact, including, but not limited to, asking the party reporting child abuse or neglect whether he or she has any information that the child may be an Indian child."

Subdivision (b) of former section 224.2 expressed the county welfare department's inquiry duty as follows: "If a child is placed into the temporary custody of a county welfare department pursuant to Section 306 . . . the county welfare department . . . has a duty to inquire whether that child is an

Indian child. Inquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child."

A concurring opinion in *In re Adrian L.* (2022) 86 Cal.App.5th 342, 353 (*Adrian L.*) (conc. opn. of Kelley, J.) appears to be the first published appellate decision to view the statutory language in addressing the specific question before us: Whether former section 224.2's extended-family inquiry duty applied to cases in which a child was removed from their home pursuant to a warrant under section 340. Relying on the phrase "[i]f a child is placed into temporary custody . . . pursuant to Section 306" (former § 224.2, subd. (b)), the concurring justice in *Adrian L.* concluded that county welfare departments had *two* types of initial inquiry duties: a duty that applied to warrantless removals, and a narrower duty that applied when the initial removal was pursuant to a warrant. The concurring justice reasoned that because the child in that case had been removed from his home pursuant to a warrant, the county welfare department had no duty to ask extended relatives about his Indian ancestry. (*Adrian L.*, at p. 353 (conc. opn. of Kelley, J.).)

Like the concurring justice in *Adrian L.*, the Department relies on the phrase "[i]f a child is placed into . . . temporary custody . . . pursuant to Section 306" (former § 224.2, subd. (b)) to argue that a county welfare department's extended-family inquiry duty arose under the former statute *only* when a child was placed into temporary custody after being removed from the home *without a warrant.* (Citing *Ja.O.*, *supra*, 91 Cal.App.5th at p. 679.) According to the Department, "it is hard to imagine

any clearer statutory language" than that of former section 224.2, subdivision (b), which provided the extended-family inquiry duty arose when a child was placed into its temporary custody "pursuant to Section 306," and not also "pursuant to section 340" relating to removals with a warrant.

The Court of Appeal in this case took a similar view, reasoning: "All of the children in this case were taken into protective custody pursuant to a warrant under section 340 . . . [and] therefore were not taken into temporary custody . . . pursuant to section 306. . . . The expanded duty of initial inquiry under subdivision (b) of section 224.2 consequently does not apply." (*Ja.O.*, *supra*, 91 Cal.App.5th at p. 679.)

The statutory interpretation of the Department and the *Ja.O.* court presumes section 306 covers warrantless removals only, but we conclude the phrase "pursuant to Section 306" also reasonably encompasses removals pursuant to warrant under section 340. It is true, as the *Ja.O.* court noted, that section 306, subdivision (a)(2) refers only to a social worker's authority to "[t]ake into and maintain temporary custody" of a child "*without a warrant*" and makes no mention of removals *with* a warrant. (§ 306, subd. (a)(2); see *Ja.O.*, 91 Cal.App.5th at p. 678.) Thus, if former section 224.2, subdivision (b) had provided that the extended-family inquiry duty applied when a child was placed into temporary custody "pursuant to Section 306, *subdivision (a)(2),*" the duty may very well have applied only to warrantless removals. However, former section 224.2, subdivision (b) referred to section 306 generally — i.e., "placed into . . . temporary custody . . . pursuant to Section 306" — not just to subdivision (a)(2). Notably, *subdivision (a)(1)* of section 306 contains no language restricting its application only to warrantless removals. Instead, it provides a social worker may

14

"[r]eceive and maintain, pending investigation, temporary custody of a child who is described in Section 300, and who has been delivered by a peace officer";[9] it does *not* limit the social worker's authority to "[r]eceive and maintain" a child to situations in which the child has been removed from the home without a warrant. (§ 306, subd. (a)(1).) Thus, section 306, subdivision (a)(1) is reasonably read as applying to both types of removals. Accordingly, former section 224.2's extended-family inquiry duty applied whenever a child was placed into a county welfare department's temporary custody, regardless of whether the child was removed from the home with or without a warrant.

As explained by the majority in *Delila D.*, which read former section 224.2 as we do, when a child is removed from the home pursuant to a warrant, the *removal* is authorized by section 340, and the *placement* into temporary custody is authorized by section 306, subdivision (a)(1). (*Delila D., supra*, 93 Cal.App.5th at p. 971, review granted, citing § 340, subd. (c) [a child who is taken into protective custody must be "delivered" to a social worker for investigation].) And when a child is removed from the home without a warrant, the *removal* is

---

[9]    Section 306, subdivision (a)(1) uses the phrase "delivered by a *peace officer*" (italics added), presumably because warrants are usually executed by, or at least with the assistance of, a police officer, as was the warrant in this case; however, social workers themselves may, at times, act as "peace officers" (Pen. Code, § 830.3, subd. (h) [some social workers are "peace officers" when performing their primary duty]) and "deliver[]" (§ 306, subd. (a)(1)) a child to another social worker for investigation after removing the child pursuant to a warrant. Thus, section 306, subdivision (a)(1) reasonably includes situations in which a "peace officer," or a social worker, removes a child pursuant to a warrant.

authorized by section 306, subdivision (a)(2), or sections 305 and 305.6 (which provide additional circumstances under which a child may be removed from the home without a warrant), and the *placement* into temporary custody is authorized by section 306, subdivision (a)(2). (*Delila D.*, at p. 972.) In either circumstance, what triggered the county welfare department's initial inquiry duty under former section 224.2, subdivision (b) was not *the method of removal* from the home — with or without a warrant — but the "*place[ment]* into the department's temporary custody under section 306, subdivision (a)(1)." (*Delila D.*, at p. 972.) This interpretation, which ties the county welfare department's initial inquiry duty to the child's *placement* into temporary custody under section 306, rather than the child's initial *removal* from the home, makes sense because it is the county welfare department, not the individual or entity that removes the child from the home, that is "charged with conducting the ICWA investigation in a dependency proceeding." (*Delila D.*, at p. 972.)

In contrast, the interpretation of the *Ja.O.* court and the Department leaves the statute incomplete by creating two different types of inquiry duties — an extended-family inquiry duty for warrantless removals and a narrower inquiry duty for children removed from their homes pursuant to a warrant — without providing direction on the scope of the *narrower* inquiry duty. The Court of Appeal in this case, for example, concluded the Department had no duty to ask available extended family members and others about the children's Indian ancestry, but it failed to address what kind of narrower duty applied instead, or identify where in former section 224.2 or in any other statute the scope of that narrower duty was defined. (*Ja.O.*, *supra*, 91 Cal.App.5th at pp. 677–681.)

The Department suggests the narrower duty was set forth in former section 224.2, subdivision (c), which provided: "At the first appearance in court of each party, the court shall ask each participant present in the hearing whether the participant knows or has reason to know that the child is an Indian child." Here, the Department argues, "[t]here can be no dispute . . . that the children were taken into protective custody pursuant to a warrant . . . As a result, a narrower scope of inquiry applied as required by subdivision (c) of section 224.2, and that requirement was fulfilled [when] . . . [t]he court asked both parents if they had Native American ancestry."

The flaw in this argument is that former section 224.2, subdivision (c), by its express terms, described the initial inquiry duty of "*the court*," not of the county welfare department. Under former section 224.2, subdivision (a), the "court, county welfare department, and the probation department" each had their own initial inquiry duty detailed in the subsequent subdivisions — subdivision (b) for the county welfare department and the probation department, and subdivision (c) for "the court." Significantly, nothing in the language of former section 224.2 suggests the initial inquiry duty is satisfied for all three entities so long as any one of them conducts an inquiry.

The concurring opinion in *Adrian L.* and the majority in *Robert F.*, on which the Department relies, suggested the county welfare department's narrower duty was set forth in former section 224.2, subdivision (a), which included the phrase "including, but not limited to, . . . the party reporting child abuse or neglect." (See also *Adrian L.*, *supra*, 86 Cal.App.5th at p. 371 (conc. opn. of Kelley, J.); *Robert F.*, *supra*, 90 Cal.App.5th at p. 503, review granted.) However, that subdivision did not limit the scope of the inquiry duty to *only* "the party reporting child

abuse or neglect." (Former § 224.2, subd. (a).) " '[T]he word "including" in a statute is "ordinarily a term of enlargement rather than limitation" ' " (*Stone v. Alameda Health System* (2024) 16 Cal.5th 1040, 1066), and both the concurring opinion in *Adrian L.* and the majority in *Robert F.* acknowledged former section 224.2, subdivision (a), required the county welfare department to ask extended family members and others about possible Indian ancestry in at least some cases. (*Adrian L.*, at p. 371 (conc. opn. of Kelley, J.); *Robert F.*, at pp. 503–504.)

Although, for all the above reasons, we conclude the plain language of former section 224.2 reasonably required county welfare departments to conduct an extended-family inquiry in every case, we acknowledge that other Courts of Appeal have offered alternative interpretations of the former statute that were reasonable, even if ultimately less persuasive. In *In re Andres R.* (2023) 94 Cal.App.5th 828, 842–843 (*Andres R.*), for example, a majority of the court reasoned that section 306, subdivision (a)(1), which authorizes a county welfare department to "*[r]eceive and maintain*" — but not *take* — "*temporary custody* of a child . . . who has been delivered by a peace officer," presumes the child has already been taken into "temporary custody" by a peace officer before being "[r]eceive[d] and maintain[ed]" by the county welfare department. And "[t]he only statutes that authorize peace officers to take children into 'temporary custody' " relate to *warrantless* takings. (*Andres R.*, at p. 843.) "In contrast, section 340 concerns the issuance of a '*protective custody* warrant,' pursuant to which a child is taken into '*protective custody*.' (§ 340, subds. (a)–(c).)" (*Andres R.*, at p. 843, italics added.) The *Andres R.* majority concluded the Legislature's decision not to reference section 340 or "protective

custody" in the language of section 306, subdivision (a)(1), could not have been "arbitrary or meaningless." (*Andres R.*, at p. 843.)

Because we cannot conclusively say there is only one reasonable way to interpret the plain language of former section 224.2, we next consider extrinsic sources such as legislative materials and public policy considerations. (See *Coalition of Concerned Communities, supra*, 34 Cal.4th at p. 737 [we look to extrinsic sources when the statutory language supports more than one reasonable construction].)

## 2. Extrinsic Sources

"ICWA and [its state analogue] Cal-ICWA are unique statutory schemes that are intended to protect Native American heritage, cultural connections between tribes and children of Native American ancestry, the best interests of Indian children, and the stability and security of Indian tribes and families." (*In re Dezi C.*, *supra*, 16 Cal.5th at p. 1125.) "[M]inimizing separation of Indian families and maximizing early placement of Indian children with extended family, other members of the child's Indian tribe, or other Indian families is the resounding preference of ICWA and of the ICWA regulations that the Bureau of Indian Affairs . . . guidelines interpret. (*In re C.L.*, *supra*, 96 Cal.App.5th at p. 388.) "This placement preference reflects '[f]ederal policy that, where possible, an Indian child should remain in the Indian community.' [Citation.] Thus, identification of a child's Indian community early on is paramount." (*Id.* at p. 389.)

Former section 224.2 was enacted as part of Assembly Bill No. 3176 (2017–2018 Reg. Sess.) § 5 (Assembly Bill 3176), which made conforming amendments to ICWA-related statutes after the 2016 adoption of new federal regulations concerning ICWA

compliance (81 Fed.Reg. 38864 (June 14, 2016) [revising 25 C.F.R. § 23 (2019)]). Those 2016 federal regulations promoted "compliance with ICWA from the earliest stages of a child-welfare proceeding" and emphasized that it is "critically important that there be an inquiry into that threshold issue [of whether a child is an Indian child] as soon as possible. If this inquiry is not timely, a child-custody proceeding may not comply with ICWA and thus may deny [ICWA] protections to Indian children and their families. The failure to timely determine if ICWA applies also can generate unnecessary delays, as the court and the parties may need to redo certain processes or findings under the correct standard. This is inefficient for courts and parties, and can create delays and instability in placements for the Indian child." (ICWA Proceedings, 81 Fed.Reg., *supra*, at pp. 38779, 38802–38803; see Bureau of Indian Affairs, Guidelines for Implementing the Indian Child Welfare Act (Dec. 2016) p. 11 (BIA Guidelines) [same].)

Similarly, the legislative history of Assembly Bill 3176 shows that one of the bill's purposes was to "increase tribes' opportunities to be involved in child custody cases involving Indian children." (Cal. Health and Human Services Agency, Enrolled Bill Rep. on Assem. Bill No. 3176 (2017–2018 Reg. Sess.) Sept. 4, 2018, p. 1.) An Assembly Republican Bill Analysis for Assembly Bill 3176 stated, "The guidelines provided . . . in [Assembly Bill] 3176 create standards that can help to increase the number of children kept within their respective tribes due to improved processes for determining a child's background." (Assem. Com. on Judiciary, Republican Analysis of Assem. Bill 3176 (2017–2018 Reg. Sess.) as amended Apr. 11, 2018, pp. 61–62.) Among other things, "[t]he bill would declare that the duty to inquire begins at the earliest possible moment and would set

forth specific steps a social worker, probation officer, or court is required to take to make that inquiry." (*Id.* at p. 62.) The bill also "clarifie[d]," "consistent with California child welfare regulation, . . . when the duty to inquir[e] begins for the court and county agencies, which is at first contact." (Enrolled Report, *supra*, at p. 3.)

Given ICWA's remedial goals and the importance of the initial inquiry as a way to ensure compliance with ICWA as early in the proceedings as possible, interpreting former section 224.2 narrowly to exclude situations in which a child was removed from the home pursuant to a warrant would be contrary to the letter and spirit of ICWA and Assembly Bill 3176. Instead, the statute is better read as requiring the county welfare department to conduct an extended-family initial inquiry whenever a child is placed into its temporary custody, regardless of how the child was removed from the home. (See *Robinson v. Fair Employment & Housing Com.* (1992) 2 Cal.4th 226, 233 [where remedial legislation is involved, we must interpret the statutory language broadly to promote its objective].)

As the majority in *Delila D.* said, "[t]here is no practical difference between children taken by warrant and those taken without a warrant, and . . . no reason to distinguish between them for ICWA inquiry purposes . . . . [I]t simply doesn't make sense to apply different initial inquiries depending on how the child was removed from the home, as that procedural happenstance has nothing to do with a child's ancestry." (*Delila D., supra*, 86 Cal.App.5th at pp. 973, 975, review granted.)

Mother provides the following example to illustrate how the method of removal should have no bearing on the scope of

the initial inquiry duty: "Imagine a mother with two children whose home environment posed an immediate threat to a child. Further imagine one child was removed without a warrant from the mother as the child was home at the time of contact, but a warrant for the second child was issued as the second child had run away from home. Under these circumstances, the child welfare agency would only be required to inquire of extended family members for the child found at the home, not the child who had run away. And if these children were half-siblings, as is often the case, the inquiry of the extended family members on the first child would not be fully relevant to the second child as there would be no inquiry as to the second child's paternal relatives at all." In this type of scenario, it is unlikely the Legislature intended to require an extended-family inquiry for one child, but not the other.

The Department counters that the Legislature intended to have the county welfare department conduct different inquiries depending on the method of removal by having state law "track[] federal guidelines" that distinguish "emergency removals" from other types of removals. The Department's argument rests on a sentence in the BIA Guidelines that provides: "It is recommended that the State agency ask the family and extended family whether the child is a Tribal member . . . and the child is eligible for membership as part of the emergency removal and placement process." (BIA Guidelines, *supra*, at p. 28.) According to the Department, because warrantless removals under section 306 are "emergency removals" and removals pursuant to a warrant under section 340 are not, the Legislature, in enacting Assembly Bill 3176, relied on the above sentence from the BIA Guidelines to implement two different

types of initial inquiry duties depending on how a child was removed from the home.

Mother responds that the term "emergency removals" as used in the BIA Guidelines includes removals pursuant to a warrant, but we need not resolve that question because even if "emergency removals" refers only to warrantless removals, we do not read the BIA Guidelines as recommending an extended-family inquiry *only* when a child is removed from the home without a warrant. The next paragraph of the BIA Guidelines, which relates to active efforts, "recommend[s] that State agencies work with Tribes, parents, and other parties as soon as possible, *even in an emergency situation*, to begin active efforts to reunite the family," which suggests this should be done as a matter of course in *non-emergency* situations. (BIA Guidelines, *supra*, at p. 29, italics added.) The BIA Guidelines also broadly state that the initial inquiry duty applies in every "emergency or voluntary or involuntary child-custody proceeding," without restriction based on the way a child is placed into the county welfare department's temporary custody. (BIA Guidelines, *supra*, at p. 9.) Thus, the BIA Guidelines do not support the Department's position.

Moreover, nothing in Assembly Bill 3176's legislative history suggests California's Legislature relied on the cited sentence from the BIA Guidelines to limit the county welfare department's extended-family inquiry duty. The various legislative committee reports and analyses contain comprehensive lists of the bill's intended changes and clarifications, but none of them contains any discussion about, or justification for, limiting the extended-family inquiry duty to situations in which removal from the home was without a warrant. (See, e.g., Sen. Com. on Judiciary, Analysis of Assem.

Bill No. 3176 (2017–2018 Reg. Sess.) as amended Jun. 18, 2018; Assem. Rules Com., Off. of Assem. Floor Analyses, 3d reading analysis of Assem. Bill No. 3176 (2017–2018 Reg. Sess.) as amended Aug. 22, 2018; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 3176 (2017–2018 Reg. Sess.) as amended Aug. 22, 2018.)  Accordingly, extrinsic sources support interpreting the former statute broadly to require the county welfare department to conduct an extended-family inquiry in all cases in which a child is placed into its temporary custody, regardless of how the child is removed from the home.

## CONCLUSION

We conclude Assembly Bill 81 clarified, rather than changed, the law.  Accordingly, section 224.2 applies to this case and requires the county welfare department to conduct an extended-family inquiry.

## DISPOSITION

We reverse the judgment of the Court of Appeal and remand the matter to the juvenile court for compliance with the inquiry requirements of section 224.2, consistent with this opinion.  If the juvenile court thereafter finds the inquiry duty has been satisfied and ICWA does not apply, the court shall reinstate the jurisdiction and disposition order.  If the juvenile court concludes ICWA applies, it shall proceed in conformity with ICWA and California implementing provisions.  (See *In re Dezi C.*, *supra*, 16 Cal.5th at p. 1141.)

JENKINS, J.

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**GROBAN, J.**
**EVANS, J.**

In re Ja.O.

S280572


Concurring Opinion by Justice Liu


I join the court's holding and the reasoning in today's opinion except for its dicta citing *Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232 and *Carter v. California Department of Veterans Affairs* (2006) 38 Cal.4th 914. (Maj. opn., *ante*, at pp. 10–12.) The court cites those cases for the proposition that the Legislature's amendment of a statute, purporting to clarify existing law, can aid judicial determination of the meaning of the original statute. But the discussion is dicta because today's opinion makes clear that "[w]e will not consider . . . other circumstances — i.e., the Legislature's statements in amending former section 224.2 or the timing of the amendment [citation] — because our statutory interpretation answers the question before us." (*Id.* at p. 11, fn. 8.)

I decline to join this dicta. " '[P]ost-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation' because 'by definition [it] "could have had no effect on the [Legislature's] vote." ' " (*Coker v. JPMorgan Chase Bank, N.A.* (2016) 62 Cal.4th 667, 690; see *Reno v. Bossier Parish School Bd.* (1997) 520 U.S. 471, 484–485 [" '[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.' "].) As the court acknowledges, " 'there is little logic and some incongruity in the notion that one Legislature may speak authoritatively on the intent of an earlier Legislature's enactment when a gulf of decades separates the

1

two bodies.' " (Maj. opn., *ante*, at p. 11.)  And importantly, " 'it is the duty of this court, when . . . a question of law is properly presented, to state the true meaning of the statute finally and conclusively.' " (*McClung v. Employment Development Dept.* (2004) 34 Cal.4th 467, 472.)  By contrast, "the 'Legislature has no authority to interpret a statute. . . .  The Legislature may define the meaning of statutory language by a present legislative enactment which, subject to constitutional restraints, it may deem retroactive.  But it has no authority simply to say what it *did* mean.' " (*Id.* at p. 473; see *id.* at p. 470 [declining to credit legislative statements that amendments to the California Fair Employment and Housing Act (FEHA) were " 'declaratory of existing law' " when the amendments had added language to impose liability that we said did not exist under the former version of FEHA].)  This separation of powers principle is properly observed in today's opinion, minus the dicta.

**LIU, J.**

**I Concur:**

**KRUGER, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  In re Ja.O.

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 91 Cal.App.5th 672
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S280572
**Date Filed:** August 4, 2025

_____

**Court:**  Superior
**County:**  San Bernardino
**Judge:**  Steven A. Mapes

_____

**Counsel:**

Janelle B. Price, under appointment by the Supreme Court; and Donna Chirco for Defendant and Appellant.

Leslie A. Barry and Christopher Blake for California Appellate Defense Counsel and Children's Law Center of California as Amici Curiae on behalf of Defendant and Appellant.

Tom Bunton, County Counsel, Dawn M. Martin, Svetlana Kauper and Landon Villavaso, Deputy County Counsel, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Donna Chirco
Appellate Defenders, Inc.
555 West Beech Street #300
San Deigo, CA 92101
(619) 696-0282

Landon Villavaso
Deputy County Counsel
385 North Arrowhead Avenue, 4th Floor
San Bernardino, CA 92415
(909) 387-0512